UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BRUCE E. ELLISON, M.D., <br><br> Plaintiff, <br><br> v. <br><br> AMERICAN BOARD OF ORTHOPAEDIC SURGERY, INC., <br><br> Defendant. | Civ. No. 16-8441 (KM) (JBC) <br><br> OPINION |

### KEVIN MCNULTY, U.S.D.J.:

Pending before the Court is the motion of defendant American Board of Orthopaedic Surgery, Inc. ("ABOS"), to dismiss the Second Amended Complaint filed by plaintiff Bruce E. Ellison, M.D. ("Dr. Ellison") (DE 48). Two predecessor complaints have already been dismissed on motion of ABOS.

Dr. Ellison's Second Amended Complaint[1] asserts one count based on alleged violations of federal antitrust law in relation to the certifications ABOS provides to certain qualifying physicians ("Board Certification"). Dr. Ellison asserts that ABOS improperly restrains trade by colluding with hospitals in requiring orthopedic surgeons to obtain Board Certification as a condition of practicing at those hospitals. ABOS allegedly prevents Dr. Ellison from obtaining Board Certification unless he first has hospital medical staff privileges, thereby reducing competition at hospitals by excluding surgeons who, like Dr. Ellison, practice exclusively at ambulatory surgery centers or other places that do not offer those medical staff privileges. Dr. Ellison

---

[1] The following abbreviations are used herein:

"DE __" = Docket Entry in this case

"2AC" = Second Amended Complaint (DE 48)

1

primarily seeks declaratory and injunctive relief, but also damages, costs, and fees. ABOS has moved to dismiss the Second Amended Complaint, asserting grounds similar to those in its prior motion to dismiss the First Amended Complaint (see DE 29).

For the reasons stated in this opinion, I will dismiss the Second Amended Complaint pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted.

## I. Summary

### a. Factual background

I recap the factual background from my prior opinion, supplementing as necessary with facts newly asserted in the Second Amended Complaint.

Dr. Ellison holds a medical license in California, where he currently treats patients as an orthopedic surgeon. (2AC ¶¶ 11, 32) For "personal and professional reasons, Dr. Ellison would like to obtain medical staff privileges" at a hospital in northern New Jersey. (*Id.* ¶ 11) The hospitals to which he says he *would* apply for privileges—but has not actually applied—require that he possess Board Certification provided by ABOS. (*Id.* ¶ 29)

Defendant ABOS—the only defendant in this action—oversees the Board Certification program for physicians specializing in orthopedic surgery. (*Id.* ¶ 3) Defendant ABOS is incorporated in Delaware. (*Id.* ¶ 12) It has directors and officers who reside in many different states, although the 2AC does not specify where these members reside. (*Id.* ¶ 12) ABOS arranges for the administration of the written portion of its Board Certification exam through a third-party subcontractor at testing locations throughout the United States, including in New Jersey, collects "up to a million dollars or more annually" from physicians located in New Jersey, and communicates with hospitals and patients in New Jersey about which physicians hold Board Certifications. (*Id.* ¶¶ 36–39) Defendant ABOS does not maintain any offices, records, property, or staff in New Jersey. (DE 49-3 ¶ 4)

2

ABOS is a member of the American Board of Medical Specialties ("ABMS"). (*Id.* ¶ 2) ABMS is *not* a defendant here, nevertheless, the Second Amended Complaint provides additional color with respect to this entity. According to one article cited in the Second Amended Complaint, ABMS

> continues to be the leading not-for-profit organization overseeing physician certification in the United States. ABMS establishes the standards its 24 Member Boards use to develop and implement educational and professional evaluation, assessment, and certification of physician specialists. More than 860,000 physicians are certified in one or more of the approved 37 specialties and 86 subspecialties offered by the ABMS Member Boards.

(*Id.* ¶ 6, n.2 (citing https://www.prnewswire.com/news-releases/the-american-hospital-association-joins-abms-multi-specialty-portfolio-program-300435665.html))

The Second Amended Complaint includes additional details about another entity, the American Hospital Association ("AHA"), which is also *not* a defendant. Nearly 90% of all hospitals are members of AHA (*Id.* ¶ 4) AHA is a non-profit that provides "education for health care leaders and is a source of information on health care issues and trends." (*Id.* ¶ 6, n.2) AHA and ABMS have interlocking memberships. (*Id.* ¶ 5).

The 2AC asserts that AHA and ABMS (again, not defendants here) entered into an agreement in April 2017 to "provide money-making programs in connection with board certification by [defendant] ABOS and other specialty groups." (*Id.* ¶ 6) The Second Amended Complaint adds that AHA announced in 2017 that it had joined the ABMS Multi-Specialty Portfolio Program. This program allows

> Hospitals and health systems participating in the AHA's Health Research & Educational Trust (HRET) Hospital Improvement Innovation Network (HIIN) [to] facilitate Maintenance of Certification (MOC) Improvement in Medical Practice (Part IV) credit for physicians who are Board Certified by one of the 21 of 24 ABMS Member Boards participating in the Portfolio Program.
>
> The HRET HIIN is the first HIIN in the country to offer this service to its more than 1,600 participating hospitals. Through

3

> ABMS MOC Part IV credit, physicians can meet the requirements for maintaining their certification while meaningfully participating in quality improvement programs in their organizations. Partnering on ABMS MOC Part IV also will reduce duplication of quality improvement efforts; HRET HIIN hospitals currently are engaged in improvement efforts across 11 hospital-acquired condition topics. Physicians' roles in these projects may vary from team member to physician champion. Projects will be data-driven, focused on patient safety, and designed to implement evidence-based best practices. AHA hopes this program will encourage the development of long-lasting improvements, while strengthening physicians' connection to the improvement efforts of their broader organizations.
>
> "We are very pleased to be the first HIIN to provide this valuable service," said Jay Bhatt, DO, HRET President and AHA Chief Medical Officer. "Aligning physicians' pursuit of their Board Certification with hospitals' quality improvement efforts will accelerate our collective efforts to improve patient safety by promoting team-based care delivery."

(*See Id.* n.2 (citing https://www.prnewswire.com/news-releases/the-american-hospital-association-joins-abms-multi-specialty-portfolio-program-300435665.html))[2] Dr. Ellison does not contend that this recent agreement to provide continuing certification impacts him. Rather, Dr. Ellison alleges that ABMS and AHA have previously entered into "similar agreements" to promote ABOS and other specialty groups. As part of this "arrangement," "ABOS excludes Plaintiff from obtaining board certification by ABOS unless he first has hospital medical staff privileges, and AHA member hospitals exclude physicians unless they have board certification." (2AC ¶¶ 6, 7) To achieve this agreement, "ABMS and its members put pressure on hospitals through AHA, to

---

[2] Dr. Ellison cites to a number of other articles in the 2AC. Many of these articles are from the early 2000s, and they do not specifically refer to ABOS. (*See* 2AC ¶¶ 15 (citing a CMS Director Survey and Certification Group article from 2004 concerning the requirements for hospital medical staff privileging); ¶ 16 (citing two studies from 2007 and 2009 regarding hospital privileging as it relates to board certification); ¶ 18 (citing a 2005 article titled "Board Certification as Prerequisite for Hospital Staff Privileges"))

4

require ABMS specialty board certification, which includes ABOS." (*Id.* ¶ 18; *see also id.* ¶¶ 19, 20)

According to the Second Amended Complaint, the largest hospital systems in northern New Jersey, like RWJBarnabas, have joined into a conspiracy to make money since they are members of the AHA and require the hospitals under their purview to provide medical staff privileges only to doctors who have obtained Board Certification. (*Id.* ¶¶ 4, 23–26) St. Peter's University Hospital, located in New Brunswick, New Jersey, also requires Board Certification as a condition of obtaining medical staff privileges. (*Id.* ¶ 27) Similarly, Rutgers University Hospital requires Board Certification in order to obtain medical staff privileges and will not process the applications for employment of prospective doctors unless the applicant has acquired Board Certification within seven years after completing residency training. (*Id.* ¶ 26) The Board Certification process is controlled by ABMS and, for Dr. Ellison, ABOS such that other equally rigorous board certification programs offered by other organizations are not recognized. (*Id.* ¶¶ 28, 48) Thus, says Ellison, ABMS and its members ABOS, AHA, and member hospitals all have an arrangement to exclude Dr. Ellison from obtaining board certification. (*Id.* ¶ 7)

Dr. Ellison alleges that the requirement for Board Certification precludes him from obtaining medical staff privileges "at the major hospitals in the regions of northern New Jersey." (*Id.* ¶ 29; *see also* ¶ 9) Dr. Ellison successfully passed the written portion of ABOS's exam ("Part I") in Chicago, Illinois. (*Id* ¶ 53; DE 49-3 ¶ 6) This qualified him to take the oral portion of the exam ("Part II"), which is only administered in Chicago. (2AC ¶¶ 53–55; DE 49-3 ¶ 7) However, ABOS subsequently refused to allow him to take Part II of the exam because he did not have medical staff privileges. (*Id.* ¶¶ 44, 56)

This, says Dr. Ellison, confronted him with the proverbial catch-22: without medical staff privileges he cannot take Part II of the certification exam, but without certification he cannot acquire medical staff privileges. This practice, Dr. Ellison alleges, reduces competition to hospitals by shutting out

5

surgeons, like himself, who practice exclusively at ambulatory surgery centers (which do not provide medical staff privileges), thereby reducing the number of orthopedic surgeons available to patients. (*Id.* ¶ 43) There is an exception to the staff-privileges prerequisite for physicians who have completed their residency within the last seven years, but that exception is unavailable to Dr. Ellison at this later stage of his career. (*Id.* ¶ 7)

Dr. Ellison has not applied for medical staff privileges at these New Jersey hospitals because, he says, without board certification, rejection is likely. He is therefore unwilling to apply, because a rejection of an application for medical staff privileges allegedly "results in an automatic adverse entry in the National Practitioner Data Bank, which severely damages the reputation of a physician." (*Id.* ¶ 30)

Dr. Ellison asserts that ABOS has unlawfully acted in concert with hospitals to require Board Certification as a precondition for employment, thus interfering with the market for orthopedic surgery services at hospitals in northern New Jersey. (*Id.* ¶¶ 41, 57) He also claims that ABOS has engaged in an anticompetitive tying arrangement in violation of Section 1 of the Sherman Act. (*Id.* ¶ 60) In this respect, ABOS and the hospitals are allegedly acting in concert for ABOS's pecuniary benefit. (*Id.* ¶ 58) This pecuniary benefit for these organizations is the only justification suggested by Dr. Ellison for the Board Certification precondition for obtaining medical staff privileges. He suggests that this must be the case because, from 2007–2017, the use of board certification in hospital privileging significantly increased, but that increase was not accompanied by improved physician competence or better outcomes for patients. (*Id.* ¶¶ 15–22) Instead, the only reason for the increase in Board Certification is ABOS's and ABMS's continued pressure on hospitals to require Board Certification as a condition of medical staff privileges. (*Id.*)

This restraint, Dr. Ellison asserts, reduces "the availability of physicians in the relevant market, which reduces patient choice and increases health care costs." (*Id.* ¶ 61) He seeks damages, a declaratory judgment that ABOS has

6

violated the Sherman Act, injunctive relief allowing Dr. Ellison to take Part II of the exam, and an order requiring ABOS to cease requiring surgical privileges as a precondition for taking Part II of the exam. (*Id.* ¶¶ 56–61)

### b. Procedural history

This case, or some version of it, has been pending for over four years.

In December 2015, Ellison first brought suit against ABOS in the district where it is located, *i.e.*, the United States District Court for the Northern District of Illinois (the "Illinois Complaint"), seeking the same relief he seeks in this action. *See Ellison v. American Board of Orthopaedic Surgery, Inc.*, No. 15-cv-11848, Docket Entry 1, Illinois Complaint ¶¶ 3, 28–32. However, Dr. Ellison voluntarily dismissed the Illinois Complaint in April 2016. *Id.*

That same month, Dr. Ellison filed a factually similar complaint in the Superior Court of New Jersey, Law Division, Union County, alleging that ABOS violated the New Jersey Consumer Fraud Act ("NJCFA"), N.J. Stat. Ann. § 56:8-1, *et seq.*, and the New Jersey Antitrust Act, N.J. Stat. Ann. § 56:9-1, *et seq.* (*See* DE 1) Dr. Ellison sought treble damages, attorneys' fees, and declaratory and injunctive relief requiring ABOS to allow him to take the Part II exam.

In November 2016, ABOS removed the case to federal court ("Removed Complaint") on the basis of diversity of citizenship. *See* 28 U.S.C. § 1332(a). The notice of removal stated that Dr. Ellison is domiciled in California, and that ABOS is a Delaware corporation with its principal place of business in North Carolina. (DE 1 ¶¶ 11–15)[3]

In February 2017, ABOS moved to dismiss the Removed Complaint on a variety of grounds. (DE 4) I granted that motion and dismissed the Removed Complaint pursuant to Rule 12(b)(6) for failure to meet the minimal pleading standards of Rule 8. (DE 17) In that opinion I noted, *inter alia*, that "[t]he

---

3     The Removed Complaint alleged, less specifically, that Dr. Ellison is located in California and that ABOS is headquartered in North Carolina. (DE no 1-1 ¶¶ 2, 3; DE 1-3, Civil Cover Sheet)

7

vagueness of the Complaint makes it difficult to discern what, if anything, connects Dr. Ellison, ABOS, and any wrongful acts to the State of New Jersey." (*Id.* at p. 5.) Additionally, without any allegation of a concrete injury in fact, I could not "accept that Dr. Ellison possesse[d] a cause of action in any jurisdiction where he theoretically could have sought, and been refused, admitting privileges." (*Id.*) Finding that Dr. Ellison had failed to state a claim, I did "not reach, or prejudge" the issues related to personal jurisdiction, venue, or standing raised by ABOS and entered the dismissal of the Removed Complaint without prejudice to the filing of a motion to amend. (*Id.*) However, I flagged numerous challenges facing plaintiff, including the issues of personal jurisdiction and venue, as follows: "the plaintiff may wish to consider whether it make more sense to file this lawsuit in a district where the defendant is incorporated and has its principal place of business, or in the alternative in a district where the acts complained of actually took place." (*Id.* at p.5.)

Dr. Ellison subsequently moved for leave to amend, which was granted, and filed an Amended Complaint. (DE 21, 27, 28) *See Ellison v. Am. Bd. of Orthopaedic Surgery, Inc.*, No. 16-8441, 2018 WL 1919953, at *1 (D.N.J. Apr. 24, 2018). The Amended Complaint dropped the counts alleging violations of New Jersey state law and instead alleged a single count of restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. (*See* DE 28)

ABOS again moved to dismiss the Amended Complaint for lack of personal jurisdiction, improper venue, lack of standing, and failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(2), (3), and (6). (DE 29) In October 2018, I issued a second opinion, again dismissing the complaint for failure to meet the pleading standards of Rule 8. (DE 34) Like the Removed Complaint, the Amended Complaint still stated "only in a conclusory manner that northern New Jersey hospitals conspired and knew about the alleged plan to bolster ABOS's market position." (*Id.* p. 8.) I found that the "Amended Complaint does not assert any plausible basis for a conspiracy between ABOS and the vast network of New Jersey hospitals, nor does the Amended Complaint include any

8

plausible allegations that place the hospitals' conduct in a context that raises a suggestion of a preceding agreement." (*Id.* p. 9.)

Dr. Ellison then filed for leave to file a Second Amended Complaint (DE 41), which was granted (DE 47). On June 13, 2019, Dr. Ellison filed the Second Amended Complaint. (DE 48) Eight days later, on June 21, 2019, ABOS again moved to dismiss on the basis that the Second Amended Complaint still suffered from the same deficiencies as the Removed Complaint and the Amended Complaint, namely that the

> Second Amended Complaint does not cure the standing and jurisdictional flaws identified by the Court when it granted ABOS' first motion to dismiss. Nor does it adequately allege 1) an anticompetitive conspiracy between ABOS and any specified New Jersey hospitals or 2) an illegal tying arrangement, as the Court, in granting ABOS' most recent motion to dismiss, advised Plaintiff he would be required to do.

(DE 49). Plaintiff opposed the motion (DE 51), and defendant filed a reply (DE 54).

## II. ANALYSIS

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Animal Science Products, Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n. 9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *New Jersey Carpenters & the Trustees Thereof v. Tishman Const. Corp. of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014).

Federal Rule of Civil Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the

9

complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570; *see also West Run Student Housing Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 169 (3d Cir. 2013). That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Iqbal*, 556 U.S. at 678.

### A. Sherman Act claim

The Sherman Anti–Trust Act declares "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States ... to be illegal." 15 U.S.C. § 1. "Although this prohibition is literally all-encompassing, the courts have construed it as precluding only those contracts or combinations which 'unreasonably' restrain competition." *Animal Sci. Prod., Inc.*, 34 F. Supp. 3d at 480 (quoting *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 4–5 (1958)).

"In order to sustain a cause of action under § 1 of the Sherman Act, the plaintiff must prove: (1) that the defendants contracted, combined, or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiff was injured as a proximate result of that conspiracy." *Martin B. Glauser Dodge Co. v. Chrysler Corp.*, 570 F.2d 72, 81–82 (3d Cir. 1977). *Accord Howard Hess Dental Laboratories Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 253 (3d Cir. 2010); *cf. Franco v. Connecticut Gen. Life Ins. Co.*, 818 F.Supp.2d 792, 829 (D.N.J. 2011) ("Pleading a colorable Sherman Act section 1 claim requires a plaintiff to allege (1) an agreement (2) imposing an unreasonable restraint of trade within a relevant product market and (3) resulting in antitrust injury, that is 'injury of the type the antitrust laws were

10

intended to prevent and ... that flows from that which make defendants' acts unlawful.'").

"The existence of an agreement is the hallmark of a Section 1 claim. Liability is necessarily based on some form of concerted action.... The agreement, of course, must pertain to some unlawful conduct within the meaning of the antitrust laws. To establish liability under section 1, a plaintiff must demonstrate that the challenged practice imposed an unreasonable restraint on trade. The illegality of the restraint may be demonstrated in one of two ways: under the per se standard or under a rule of reason analysis." *Franco*, 818 F.Supp.2d at 829–30 (D.N.J. 2011) (internal citations and quotations omitted).

"The rule of reason requires courts to conduct a fact-specific assessment of 'market power and market structure ... to assess the [restraint]'s actual effect' on competition." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (citation omitted). "While the rule of reason typically mandates an elaborate inquiry into the reasonableness of a challenged business practice, there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable. Such plainly anticompetitive agreements or practices are deemed to be illegal per se." *United States v. Brown Univ. in Providence in State of R.I.*, 5 F.3d 658, 669 (3d Cir. 1993) (internal quotations and citations omitted). The types of "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use ... are price fixing, division of markets, group boycotts, and tying arrangements." *N. Pac. Ry. Co.*, 356 U.S. 1, 5 (1958). *Accord Arizona v. Maricopa County Med. Soc.*, 457 U.S. 332, 345 (1982); *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 830 (3d Cir. 2010) ("Some categories of restraints, such as horizontal price-fixing and market allocation agreements

11

among competitors, 'because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable.'") (quoting *Brown Univ. in Providence in State of R.I.*, 5 F.3d at 669); *In re Ins. Brokerage*, 618 F.3d at 316 ("Paradigmatic examples [of per se illegal restraints] are 'horizontal agreements among competitors to fix prices or to divide markets.'" (quoting *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007))).

### 1. Agreement

"To allege such an agreement between two or more persons or entities, a plaintiff must allege facts plausibly suggesting 'a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'" *Howard Hess Dental Labs. Inc.*, 602 F.3d at 254 (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 755 (1984)). With respect to the alleged conspiracy between ABOS and northern New Jersey hospitals, Dr. Ellison has failed to allege facts that plausibly suggest such an unlawful arrangement.

Dr. Ellison has alleged no facts supporting a *per se* restraint of trade. The Second Amended Complaint, like the complaints that preceded it, states only in a conclusory manner that northern New Jersey hospitals "conspired" with ABOS to require certification. But "[r]esort to per se rules is confined to restraints. . . that would always or almost always tend to restrict competition and decrease output." *Leegin*, 551 U.S. at 886. There are no facts alleging any type of agreement suggestive of plainly anticompetitive conduct that amounts to a *per se* unlawful restraint.

The claim is tantamount to one that hospitals cannot require physician qualifications unless they run their certification programs themselves, lest they "conspire." But there is nothing inherently harmful or unlawful about a hospital requiring physicians to be certified. It cannot be said that such a practice has no legitimate purpose, and can only be aimed at restraining trade. It has an obvious medical rationale. For this reason, a hospital's requirement

12

that physicians meet certain qualifications will rarely if ever found to be *per se* unreasonable. *See, e.g., Weiss v. York Hosp.*, 745 F.2d 786, 820 (3d Cir. 1984) ("The Medical Staff is, however, entitled to exclude individual doctors, including osteopaths, on the basis of their lack of professional competence or unprofessional conduct . . . We recognize, therefore, that in many cases involving exclusion from staff privilege, courts will, more or less openly, have to utilize a rule of reason balancing approach."); *Miller v. Indiana Hosp.*, 843 F.2d 139, 144 (3d Cir. 1988) ("We recognized that in a hospital staff privilege case in which the hospital defends on lack of professional ability, the rule of reason test would apply."); *see also BCB Anesthesia Care Ltd. v. Passavant Mem. Area Hosp. Ass'n*, 36 F.3d 664, 667 (7th Cir. 1994) (noting that courts "invariably analyze" antitrust claims based on hospital credentialing decisions under the rule of reason because "there is nothing obviously anticompetitive about a hospital choosing one staffing pattern over another or in restricting the staffing to some rather than many or all").

The allegations in the 2AC also fail under the Rule of Reason analysis. The Second Amended Complaint reiterates, for instance, that "Defendant ABOS has undertaken its actions with a common design and understanding with hospitals to exclude some competent orthopedic surgeons from the relevant market, including Dr. Ellison." (2AC ¶ 62) This type of conclusory allegation is found throughout the 2AC. (*E.g., id.* ¶¶ 6, 9, 14, 41, 44, 57, 58, 60, 61, 62, 63). "But to survive dismissal it does not suffice to simply say that the defendants had knowledge; there must be factual allegations to plausibly suggest as much." *Howard Hess Dental Labs. Inc.*, 602 F.3d at 255 (citing *Twombly*, 550 U.S. at 564).

There are no such allegations here. Without more, the mere fact that certain hospitals require Board Certification for admitting privileges combined with a bare assertion that hospitals conspired with ABOS is not a sufficient allegation of an unlawful agreement. *See Twombly*, 550 U.S. at 556-57 ("[A]n allegation of parallel conduct and a bare assertion of conspiracy will not

13

suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality. Hence, when allegations of parallel conduct are set out in order to make a [Sherman Act] § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.").

Nothing in this complaint goes beyond an allegation that the hospitals chose to require certification by an outside organization, ABOS. These entities do not conspire any more than the hospitals "conspire" with medical schools by virtue of requiring their doctors to possess a medical degree. The facts to support a conspiratorial agreement or a coercive arrangement are lacking.

Dr. Ellison attempts to bridge that gap with public statements made by ABMS (to which Defendant ABOS is alleged to belong). According to the complaint, ABMS stated that it "encourages hospitals and insurers to consider it when granting or delineating clinical privileges." (2AC ¶ 64; *see also* ¶ 18). To begin with, these statements are attributable to ABMS and AHA—not defendant ABOS. In any event, they continue to miss the mark. There is nothing inherently unlawful about ABMS "encouraging" certain hospitals to accept its certification program. These vague allegations that ABMS influenced or pressured hospitals into requiring board certification actually suggest just the opposite. *Lacking* any actual agreement with hospitals, ABMS engaged in public marketing efforts in an attempt to expand the reach of its programs. The statements cited by Dr. Ellison confirm as much:

> We all know that the hospital business is a competitive one, and the more we can do to ensure patients, our insurers, and patient advocacy groups that we deliver the highest quality care, the better off we are. There has also been pressure from specialty boards encouraging us to restrict staff privileges to those physicians who have board certification. Our Board of Trustees has been struggling with the issue for more than a year, and, after many rounds of talks, they have decided that we will begin to require board certification for all physicians who have staff privileges.

14

(2AC ¶ 18). Implicit in this statement is the recognition by that hospital that it must compete for patients by offering high quality services. While this particular hospital struggled with the decision, its trustees ultimately agreed that one way to compete and ensure quality care was to require board certification for its physicians. There is no allegation, by the way, that this article refers to any of the hospitals mentioned in the complaint. (*See* 2AC ¶ 25)

In any event, the 2AC asserts nothing to suggest that this large collection of New Jersey hospitals decided to require board certification as a prerequisite to medical staff privileges based on an illicit agreement, rather than as the result of their own independent calculation that this requirement would improve the quality of care or make them more competitive in attracting patients. The time, place, or manner of the alleged "agreement" is not specified. The Second Amended Complaint does not assert any facts directly suggesting such an between ABOS and the New Jersey hospitals; nor does it indirectly state a factual context that implies a preexisting agreement with ABOS. Dr. Ellison has not pled "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556.

Nor has Dr. Ellison alleged facts sufficient to suggest that ABOS has sufficient market power to affect a restraint of trade. Dr. Ellison in one sense frames the allegations in the 2AC as restricting trade because ABOS prevents him from getting certified by other equally rigorous board certification programs offered by other organizations. (2AC ¶¶ 28, 48) Of course, "exclusionary practices in themselves are not sufficient. There must be proof that competition, not merely competitors, has been harmed" *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005). To overcome this hurdle, Dr. Ellison must allege that there are somehow fewer surgeons available to treat patients because of ABOS's restrictions. But all the 2AC can manage is a conclusory assertion that "ABOS's actions significantly reduce the availability of orthopedic surgeons in the relevant market, which reduces patient choice and increases health care costs." (2AC ¶ 61) There are no well-pled factual

15

allegations to support this sweeping conclusion. For example, Dr. Ellison does not point to any reduction of the number of surgeons available to treat patients, or resulting inflation of prices to consumers. Indeed, it is far from evident that the purported agreement between ABOS and northern New Jersey hospitals would operate in that manner. Failure to be certified, for example, does not render a surgeon unable to practice. *See Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994), *as amended on denial of reh'g* (Jan. 11, 1995) (explaining that it is "hard to see how the [defendant psychiatric board's] activities could amount to an exercise of market power, which entails cutting back output in the market and thus driving up prices to consumers" where "plaintiffs already are sellers in the market for psychiatric services [and] turning down their applications for certification does not remove their output from the market and therefore does not raise prices to consumers") (internal citation omitted).

Even if the relevant market is considered to consist only of surgeons admitted to practice at these New Jersey hospitals—an unsupported contention—the necessary facts are lacking. The complaint alleges that Dr. Ellison, a *competitor*, has been excluded from a market segment, but gives no reason to think that *competition* has been harmed—for example, that the total number of such surgeons admitted to practice at New Jersey hospitals has been reduced. That prices for surgical services are indirectly affected cannot simply be assumed, given the complex manner in which the (highly insurance-driven) market for surgical services functions.

"[I]t is commonplace, and often very useful, for organizations to recommend quality standards . . . or adopt them as part of a certification process. . . Merely to say that the standards are disputable or have some market effects has not generally been enough to condemn them as 'unreasonable' under the Sherman Act." *DM Research, Inc. v. Coll. of Am. Pathologists*, 170 F.3d 53, 57 (1st Cir. 1999). Dr. Ellison fails to sufficiently state a claim for an improper agreement under Section 1 of the Sherman Act.

16

The failure to allege an unlawful agreement alone warrants dismissal for failure to state a claim.

### 2. Tying Allegations

Dr. Ellison simultaneously asserts that defendant ABOS engaged in an improper tying arrangement. He alleges both a *per se* and a "rule of reason" tying violation. (2AC ¶P 64–65) "Tying is defined as selling one good (the tying product) on the condition that the buyer also purchase another, separate good (the tied product)." *Town Sound and Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 475 (3d Cir. 1992). "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such 'forcing' is present, competition on the merits for the tied item is restrained and the Sherman Act is violated." *Id.* at 476 (quoting *Jefferson Parish Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984)).

"[W]here (1) a defendant seller ties two distinct products; (2) the seller possesses market power in the tying product market; and (3) a substantial amount of interstate commerce is affected, then the defendant's tying practices are automatically illegal without further proof of anticompetitive effect." *Id.* at 477. That is, under these circumstances, a defendant's acts amount to a "per se" violation.

While the "per se illegality rule applies when a business practice on its face has no purpose except stifling competition," conduct that does not trigger a *per se* analysis is analyzed under a "rule of reason" test, which focuses on the particular facts disclosed by the record to determine whether the probable effect of the tying arrangement is to substantially lessen *competition*, rather than merely disadvantage some particular *competitor. Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 402–03 (3d Cir. 2016) (citations and quotations omitted).

17

Under the rule of reason test, a plaintiff must show a substantial foreclosure of the market for the relevant product. *Id.* (citations and quotations omitted). Although the test does not require total foreclosure, the challenged practices must bar a substantial number of rivals or severely restrict the market's ambit. *Id.* The "concern is not about which products a consumer chooses to purchase, but about which products are reasonably available to that consumer. For example, if customers are free to switch to a different product in the marketplace but choose not to do so, competition has not been thwarted—even if a competitor remains unable to increase its market share." *Id.* (citations and quotations omitted). However, even in cases where consumers have a choice between products, the market is foreclosed if the defendant's anticompetitive conduct renders that choice meaningless. *Id.* (citations and quotations omitted).

Here, Dr. Ellison conclusorily asserts that ABOS's board certification requirements amount to an anticompetitive tying arrangement and defines the "tying market" as "board certification for orthopedic surgeons holding an 'M.D.' degree as required by hospitals in northern New Jersey as a condition of practicing medicine there." (2AC ¶ 45) The 2AC fails to describe the operation of the alleged tying arrangement very clearly. Presumably the "tying product" is ABOS's board certification, and the the "tied product" would be hospital medical staff privileges, or the other way around.

The relevant analysis fails at the first phase of either a *per se* analysis or rule of reason analysis. This purported tying arrangement makes little sense. A tying arrangement must be viewed in light of the power wielded by the purported seller to force a consumer to buy other products it did not want, or did not want on those terms. ABOS is not plausibly alleged to possess that power. It would be ABOS's alleged "exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms" that drives the inquiry. *Town Sound and Custom Tops, Inc.*,

18

959 F.2d at 476.[4] "[T]he essence of illegality in tying agreements is the wielding of monopolistic leverage; a seller exploits his dominant position in one market to expand his empire into the next." *Times–Picayune Publishing Co. v. United States*, 345 U.S. 594, 611 (1953). There are no allegations that ABOS has influence over who is granted staffing privileges or that staffing privileges can be provided or sold by ABOS. (I set aside the difficulties in treating hospital staff status as a tied "product" sold in a market.) There are no well-pled allegations that ABOS is provided any direct monetary or other benefits as a result of a hospital issuing a surgeon staffing privileges. There are no facts tending to demonstrate that *ABOS*—the defendant here—is conditioning staff privileges on participation in its certification program, or profiting therefrom. The theory, then, must be some highly attenuated one, for which the necessary facts are not pled.

Because the 2AC fails to assert a tying arrangement or illicit agreement, the Court need not opine on whether the other elements of a Section 1 Sherman Act violation are sufficiently pled; the failure to allege an unlawful agreement alone warrants dismissal for failure to state a claim. *See Howard Hess Dental Labs. Inc.*, 602 F.3d at 254 ("Section 1 claims are limited to combinations, contracts, and conspiracies, and thus always require the existence of an agreement.").[5]

---

[4] To be clear, there is no allegation that Dr. Ellison is being forced to buy two products, when he only wanted one. Instead, he alleges that he wants both products: (1) to sit for phase II of the ABOS board certification test so that he can obtain board certification (2AC ¶ 70), and thereby obtain (2) staffing privileges from a northern New Jersey hospital. (*See, e.g., id.* ¶ 67)

[5] I therefore express no further opinion on other issues raised by ABOS. These include questions of venue, jurisdiction and standing raised by a speculative allegation that a California physician theoretically would apply for, but is likely to be denied, staff privileges at any one of a number of New Jersey hospitals.

## III. CONCLUSION

ABOS's motion to dismiss the Second Amended Complaint is granted on Rule 12(b)(6) grounds, for failure to state a claim under Section 1 of the Sherman Act. Because this complaint is in its third iteration (in this district), it appears that further amendment would be futile. This dismissal of the Second Amended Complaint as against ABOS is therefore entered with prejudice. An appropriate Order follows.

Dated: March 12, 2020

HON. KEVIN MCNULTY, U.S.D.J.